# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Michael Jacobson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with the below-listed Facebook account that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), an electronic communications company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the the below-listed Facebook account. The account in question is: Facebook account ID 100004675576772 (hereinafter the "**TARGET ACCOUNT**"), believed to be utilized by **Richard KUHNS**, further identified in Attachment A.

2. I am a Deputy United States Marshal with the United States Marshals Service ("USMS"), and I have been employed with the USMS since April 2010. One of my current duties is investigating threats against the federal judiciary. I have been conducting these types of investigations since 2015.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 115(a)(1)(B) and (b)(4), that is,

threatening a federal judge, have been committed by **KUHNS**. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. §§ 115(a)(1)(b) and (b)(4).

## PROBABLE CAUSE

6. On August 17, 2021, a physician (hereinafter "Witness") at Mosaic Hospital in St. Joseph, Missouri, telephoned the chambers of Victim, a United States District Judge in the Western District of Missouri, and left a message. Witness stated that he was a psychiatrist and had a patient named Richard **KUHNS**. Witness had **KUHNS** in a treatment session on August 17, 2021, and during the session **KUHNS** stated that he wanted to kill Victim. Victim's staff forwarded the message to the USMS for investigation.

7. I contacted Witness by telephone at approximately 3:00 p.m. on August 17, 2021. Witness reported that **KUHNS** was angry with Victim and a state judge in Andrew County, Missouri, over an unfavorable ruling. Witness stated that **KUHNS** told him he planned to wait for Victim to leave the courthouse, then he would kill him. According to Witness, **KUHNS** checked himself into the hospital voluntarily. **KUHNS** told Witness, "I need to check in before I kill someone." **KUHNS** also said, "I need to check in before I become the next Timothy McVeigh." I subsequently learned that **KUHNS** had been placed on a 96-hour involuntary civil commitment.

8. On August 18, 2021, I went to Mosaic Hospital to interview **KUHNS**. Captain

Shawn Collie with the Buchanan County, Missouri Sheriff's Office, who is also a USMS Task Force Officer, assisted with the interview. The interview was conducted in a conference room inside the psychiatric unit. A nurse was also present for the interview. Prior to asking any questions, I informed **KUHNS** of his *Miranda* rights using a form USM-99 Miranda card. **KUHNS** stated that he understood his rights and was willing to speak to us.

9. I informed **KUHNS** we received information that he had threatened to kill Victim. I asked if he had a plan to do so and he said, "I don't have a plan yet." **KUHNS** also stated, "Judges don't have immunity from not following the constitution." **KUHNS** also said, "A judge who violates their oath should be removed from office by any means necessary." I asked if "any means" meant physical harm, and **KUHNS** refused to answer. I also asked if **KUHNS** had access to any weapons and he responded, "Not at the moment." I followed up by asking **KUHNS** if he had access to weapons outside the hospital and he refused to answer. **KUHNS** stated several times, "I don't want to hurt anyone unless I have to." When asked for details on that statement, he did not answer.

10. I asked **KUHNS** what his plans were once he was discharged from the hospital. **KUHNS** responded, "I might go down south." I asked where specifically and he said, "The delta in Louisiana." I asked if **KUHNS** had friends or family there and he said, "I have associates there." Based on prior interactions with **KUHNS**, Captain Collie believed this was a reference to militia groups. During the interview, **KUHNS** referred to numerous anti-government conspiracy theories and claimed that he had been investigated or watched by other government agencies. At approximately 1:00 p.m., **KUHNS** decided he did not want to continue the interview. At that point, he was escorted out of the room by medical staff.

11. I was subsequently able to locate **KUHNS**'s Facebook profile page (the **TARGET ACCOUNT**). The **TARGET ACCOUNT** bears the username "Richard Kuhns." I believe the

TARGET ACCOUNT is utilized by KUHNS because I recognize the individual depicted in photographs on the TARGET ACCOUNT as KUHNS, based on both a comparison to known photographs of KUHNS and on my prior personal interactions with KUHNS.

12. I observed a post on the TARGET ACCOUNT dated August 16, 2021, which read, "After I Got The News From This Punk Ass Federal Judge [Victim] Yesterday About My Civil Rights Being Violated And The Judge Having Immunity To do It, I Was So Crushed, I Attempted Suicide With Meth But My Heart Didn't Stop. Maybe Instead Of Trying To Kill Myself Because Of The Oppression Maybe, Just Maybe I Should Start Killing Judges That Fail To Honor Their Oath Of Office." I also observed a post from August 15, 2021, which read, "Maybe It's Time To Start Offing These Masonic Judges and Tyrannical Political Figures. You Know Like Bring Back The Burning Them On The Stake And Force Them Back Underground Type Shit." KUHNS's Facebook profile was public, and posts on the TARGET ACCOUNT could be readily viewed.

## BACKGROUND RELATING TO FACEBOOK AND RELEVANT TECHNOLOGY

13. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

14. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

4

15. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

16. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

17. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or

her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

18. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

19. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

20. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

21. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

22. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

23. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

24. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

25. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

26. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

27. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may

communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

28.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each

other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

29. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

30. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

31. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of 18 U.S.C. §§ 115(a)(1)(b) and (b)(4), may be located in the **TARGET ACCOUNT** described in Attachment A.

32. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Because the warrant will be served on a service provider, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
Michael Jacobson
Deputy United States Marshal
United States Marshals Service

Subscribed and sworn to before me via telephone or other reliable electronic means on this __8th__ day of October 2021.

_____
HONORABLE TERESA J. JAMES
United States Magistrate Judge
District of Kansas